The case for argument is 20-1793, Omega Patents v. CalAmp Corp. Mr. Trello, whenever you're ready. Thank you, Your Honor, and may it please the Court. This is the second time this case has been before this Court. In the first appeal, the Court vacated and remanded for a new trial because, among other reasons, the infringement theory Omega and its expert pursued a trial which rested on treating signals sent by the accused LMUs as device codes required by the claims was inconsistent with the proper claim construction. Omega and the same expert pursued the same theory again at the second trial, making it clear that Omega cannot approve infringement under the proper claim construction. Therefore, the infringement judgment should be reversed. At a minimum, a new trial should be ordered. Now, the Court, we think, shouldn't even need to read through it. I don't think it's fair, Mr. Trello, to say that they pursued the same claim construction theory, which, in the original case, said that a device code was attributable to something other than the ECU, whereas here, the device code comes from the ECU and is being retransmitted by the LMU. Your Honor, I don't think that's correct. If we look at the infringement evidence with respect to the 278 patent, and that's a patent that has the limitation that requires that the controller and the vehicle device communicate using a corresponding vehicle device code from among a plurality thereof, under the proper claim construction, the corresponding device code that's being used to communicate must come from a vehicle device, and that's not the theory that Omega pursued at trial. Omega put on its infringement... But it is true, is it not, that the ECU is a vehicle device? It is true. Yes, an ECU is a vehicle device, Your Honor. And it is also true that the LMU is transmitting an ECU code, right? The LMU is transmitting a signal on the vehicle bus, and with respect to the 278 patent... But wait, you're not answering my question. And that signal does include a code coming from the ECU, which is a vehicle device, right? No, and that's where I think the proof fails, Your Honor. When Omega's expert, McAlexander, was explaining his infringement theory at trial, on direct, he didn't identify anything that met the corresponding vehicle device code limitation. Then on cross, he was pressed to explain where that element could be found. And he testified, he said that the... And this is at appendix 23, 557 to 58. He said the LMU sends out a signal with a specific code. And then when asked whether he was referring to the queries to the bus sent by the LMU, he confirmed that that's exactly what he meant. A signal sent by the LMU is not a signal from a vehicle device. And that's what the claim construction requires that the corresponding vehicle device code be. Okay, I understand that. And you may be right that an improper theory was presented to the jury. But the fact is that the record shows, does it not, that the LMU transmits an ECU code that is in the record that could have formed the basis for the jury verdict. And if it did, that would be appropriate, no? No, I don't think so, Your Honor, because no matter what the LMU is transmitting, it is not a device code under the claim construction. I don't think you're addressing my question. My question is, if the LMU transmits a vehicle device code, that is a code coming from the EMU, that would seem to satisfy the claim limitation. And there was evidence in the record that that did occur, whether or not that evidence came from the PAT-T expert. Your Honor, I just don't think that there is evidence that the LMU transmits. There is some testimony that the LMU transmits what Omega's experts said were device codes. But it's clear that he was not using device coding consistently with the claim construction. He was referring to information that was loaded onto the LMU as part of manufacturing It was not a signal from a vehicle device. And so I don't think that there is any testimony or evidence that the LMU transmits signals that it received from a vehicle device. And therefore, whatever the LMU is transmitting, it is not a device code under the claim construction. And I think that's the fundamental failure of proof with respect to the 278 infringement theory. Mr. Trella, let me move you on just because there are a number of issues here. I really do want to get to the damages question. But I have one question before that on this direct indirect infringement verdict. And you're seeking us to vacate the direct infringement. I understand what the problem is. I just don't understand how that issue is before us. And it's reviewable. I don't disagree that there would necessarily be any preclusive effect to the direct infringement, which was something that was not appealable. So I don't get how if it's not appealable, we have the authority to review it and vacate it here. Well, Your Honor, I think maybe the best way to explain it is to look at how this case really maps on to the Supreme Court decision in Camreta v. Green. In both cases, there was basically a two-part inquiry to determine whether the defendant was liable to the plaintiff. First, was there a violation or infringement of the plaintiff's rights? And second, was the defendant's actual or constructive knowledge sufficient to hold it liable for that underlying violation or infringement? And in that context, the Supreme Court said that even though the defendant had been found not liable by reason of qualified immunity, since the right wasn't clearly established, that finding was still—the underlying finding of the violation was reviewable because it could affect the defendant's conduct going forward. Now in Camreta, the court— How can that be here when the patent expired in 2016? Well, Your Honor, that's exactly the point I was about to get to. In that sense, again, this case maps on to Camreta. In Camreta, the underlying issue had become moot. There was no case or controversy because, among other things, the plaintiff had become an adult. And so the issue of minors' rights, she no longer had any stake in that. And so there was no case or controversy. So the court vacated. Here, as you said, the patent expired. Omega hasn't appealed the no-inducement finding. But the underlying finding of direct infringement by customers could still have adverse consequences for Calamp in the event of, for example, an indemnity claim by a customer sued for direct infringement by Omega. And therefore, we think the logic of Camreta says that this court can and should vacate that underlying direct infringement finding. Okay, let me move you on to damages. This case is confusing to me on a number of levels, one of which is, if we're talking about the comparable licenses, and your argument is one that I take seriously, about the lack of comparability of the licenses. Why didn't you, I know this would have happened the first trial, you never sought to have those excluded, right, under Dawbert, to say they weren't comparable. You chose instead, I understand procedurally, the other side, Dawbert or Durgai, and prevailed. Your Honor, let me make two points. First, in fact, before the second trial, we did again try, we tried to get the license agreements excluded. The court denied that motion. He said because we had not objected or moved to exclude them in the first trial, we couldn't move to exclude them in the second trial. I know you tried to get your rebuttal witness in, but I didn't recognize that in the second trial, you also tried to exclude them. We sought leave, well, we had to seek leave to file a motion, and the court denied leave because since we hadn't done it at the first trial, he said we couldn't do it at the second. And you haven't appealed that, right? No, no, we haven't appealed that. But, Your Honor, I would note that in this court's opinion in the first case, I mean, in the first appeal, the court said that whether the license agreements are admitted into evidence is a separate question from whether they can support a damages judgment. And our point is, sure, they're in the evidence. We're not saying, we haven't argued on appeal that it was improper to admit them, but they don't support the damages judgment because... Well, you are arguing on appeal, though, that I think that your witness should have been allowed to testify in rebuttal. We are, Your Honor, yes. We are. Okay. And let me just press that a little, because the way the argument is going in the briefs, there's a back and forth between just simply the failure to apportion, and then a back and forth with the comparable licenses and whether they were comparable and all of that stuff. Are those separate, or are they pretty much part of the same big picture? Well, I guess I would say that they are maybe separate parts of a big picture. I think certainly to put some meat on those bones, I think that it's possible that by explaining the differences between licenses and how the exemplar licenses might be comparable, you could in theory get to an apportionment explanation as well. But Omega didn't do either here. It made no attempt to show any incremental value for the 278 patent as used in the accused LMUs, and it didn't make any attempt to show how these licenses that it put in the record, which involved dozens of patents, US and foreign patents, these products that do things way beyond what the LMUs can do, how any of those were comparable. It just basically said, Omega, we have a policy... Sorry, can I just interrupt? Sure. I know we're over. Can I ask just a couple of questions on this point? Of course. So, Mr. Trella, what... First, did you ever try to exclude the other side's expert witness under Daubert? I don't think we tried to exclude the other side's expert. We certainly have... Okay. We certainly... Let me tell you what my problem is with your argument. And I also... I fully appreciate your argument about the comparability of these licenses and that they don't match up. But we also have the expert's testimony that the technology that this company licenses, whether they license it for five patents or 60 patents, they use a $5 fee for every single one. And if that testimony wasn't excluded and the jury was allowed to hear it and allowed his explanation of how those licenses work with regard to the hypothetical negotiation, why isn't that sufficient evidence that the jury could infer, as a matter of fact, that they would have licensed only the 278 for $5? Well, Your Honor, because... For two reasons, I think. One is because there... The fact that that's Omega's policy does not absolve it of what this court has said is basically a statutory directive. The damages have to be based on incremental value that the patented invention adds to the accused product. Second, you know, this court in... And this is a case cited both by Omega and by Calamp. In Gaylord v. U.S., this court held that... Can I just interrupt you there? I understand that incremental value stuff, but, I mean, this isn't a Fran case. This is just, you know, looking at what the damages would have been from this 278 patent. If they can show that, you know, this is the value of this patent, that they would have charged you $5, and that's an accepted fact, to license this technology to your client, why isn't that the value of the patent? Maybe I'm being simplistic, but, you know, outside the Fran context, I don't understand why we absolutely need apportionment or anything if they could show that the, you know, their policy was they're going to license this technology for $5. And if you had taken a license just for the 278 or for the whole portfolio, you would have paid $5. And I know that their expert doesn't say that exactly, but, you know, assume that that's a fair inference. Again, I'll just ask you one more time. And if you want to talk about apportionment and stuff, that's fine. I just don't understand why that's necessarily applicable here. If you can read their expert as saying the 278 would have been licensed at $5 to your client for this technology. Two responses, Your Honor. One is, I think cases like Exmark, for example, which is discussed in the briefs, make clear that the idea of apportionment and incremental value, that applies outside the Fran context. So that is a generally applicable principle. And second, as I started to allude to earlier, this court in Gaylord v. U.S. has said both sides' positions have to be considered at the bargaining table. You can't just, the plaintiff can't just rely on, well, it is my policy to charge $5. That is not sufficient to support a reasonable royalty determination. And that is all they had here. Well, except that you don't have anything on the other side because your expert got excluded and you didn't appeal that the first time around. Well, our expert was excluded. We didn't appeal it the first time around. We think we should have been entitled to present that expert in rebuttal this time around. We've explained that in our briefs. I know I'm way over time. But under 11th Circuit law, which would apply here, we should not have been precluded from presenting that expert at the retrial. Okay, but this is Judge Knight. Let me, I'm trying to understand this also. It seems to me that the problem here is that every license they presented was for multiple patents. And under Erickson and other cases, the license fee under those licenses has to be apportioned among the various patents, particularly in a case like this one, where the inventor himself said he didn't value one patent over another in that license situation. In other words, he's not saying that all the value of the licenses was attributable to the 278 patent. I completely agree, Your Honor. There is, all of the licenses they put in involved dozens of patents. There was no basis to determine any sort of value specific to the 278, particularly in the context of a limited capability product like the LMU. And so that's why one of the reasons we think this damages judgment is deeply flawed. I know I'm way over time. I know, I know. I don't want to interrupt my colleagues. So if not hearing anything more from Judge Hughes and Judge Dyke, we'll restore some rebuttal time and let's hear from Ms. Woodward. Thank you, Your Honor. Thank you. Thank you, Your Honor. And may it please the court. Starting first with the 885 patent, I agree with the point that Your Honor made. This is Judge Dyke. Just following up on the last discussion that we're having. I mean, why under Erickson and other cases like that don't you have to apportion the license fee under the patent license agreement as between the 278 patents and the multiple other patents that are covered by the agreement, something which you did not do in your damages evidence? So I think the answer to that is in one of the questions that Judge Hughes posed. In the Erickson case, the court actually noticed that the defendant does not challenge the methodology used by Erickson's damage expert. We need not consider the propriety of his apportionment analysis. The same is true here. Our damages expert was, for purposes of apportionment, had an opinion that each one patent individually under this entire licensing portfolio and licensing strategy, each one of those, so long as it included multi-vehicle data bus information, was worth $5. And that theory was not challenged via Daubert, and thus that in and of itself... I don't see any... I don't see why there's an obligation to exclude the testimony under Daubert. You can still say it doesn't provide substantial evidence to support the jury verdict. And here, I don't see that your witness, other than saying that the patentee always wanted to get $5, did anything to support the notion of no apportionment here. So I believe that the apportionment is in the way that these licenses are taken. It's supported also not only by, like I said, the unchallenged theory and opinion of our expert, but it was also supported by Mr. Flick himself, who said that when he went into this, there was originally a different structure of his licensing, where for the first feature it was $5, and then it would be $0.50 or $0.25 thereafter. Eventually, because of the difficulties in administrating a program like that, that had a structured and additional add-on component, he eventually went to this, and said, okay, it's $5 for whatever patent you license. That's his licensing policy. You have here a hypothetical negotiation, in which somebody can't just say, well, it's my policy to demand so-and-so, so that's the end of the matter. You have to support apportionment among the various patents covered by the license, particularly when your own witness said that he can't say that the 278 has more value than the other patents covered by the license. I just don't get it. But what he said was, you would be licensing, in all of these licenses, the licenses are laid out, so that if you are using any one claim from any one of these patents, that's what starts the $5. That's what Mr. Flick said as well. It doesn't suggest that that's an apportionment or something that's binding in a hypothetical negotiation. I mean, you took that position, any patentee could say, well, my policy is not to give a license for anything more than X, and that would be the end of the matter, and that's not the end of the matter in these hypothetical negotiations, right? Well, it's one thing to say it, Your Honor, and that's the point that I think Mr. Chella was making with the Gaylord case, is that it's one thing to say it, but it's another thing to come into court with 18 licenses, all of which have been negotiated. Many of them were negotiated outside, you know, all of them were negotiated at arm's length. Every single one of those licenses has multiple patents, right? That's correct. Okay. But they also do distinguish between different types of technology. So as we saw, there was $5 for any that include the multi-vehicle functionality, which the 278 no question does. Then there were separate agreements for $1 if it was simply data to track, and there were additional rates or different rates if it was simply GPS without multi-vehicle functionality. So we know that there is, there is within that evidence of apportionment that multi-vehicle functionality where you're getting data off the bus and can do so for multiple vehicles, all of this suggests that that technology is worth $5. And before we move on, I want to point out that this is also consistent with the, with the evidence that was submitted by Cal-AM's own witnesses about the value of their infringing LMUs. Iberger testified, for example, that there would be no value without the downloading of scripts, which is one of the key parts of the 278 patent. Hergesheimer, I think that's how you say that, he also testified similarly. He talked about the importance of the multi-vehicle functionality to its customers, the difficulty in trying to design around that, and the value, again, of having multi-vehicle functionality in its LMUs. So all of that testified... If you're looking at your brief, red brief, page 35 and 36, and that's where you make an argument that the seals were driven primarily, if not exclusively, by the invention of the 278 patent, what gives me pause is a statement you have on page 35, which says, the jury heard the infringing LMUs have no component parts outside of what is found in the 278 patent. Well, the 278 patent covers the controller, and in that respect, I think Mr. Trella makes the point that it's very much like the Exmark case, which you raised as well, where they cover... You didn't invent everything of the controller, right? The patent is on a specific feature. So to say that LMUs have no component parts outside what is found in the 278 patent is quite misleading, isn't it? It certainly wasn't intended to be so. I think it is the invention that everything about the LMUs, there's nothing about them that isn't covered by the claims and covered by the invention of the 278, right? You don't mean that. I think what's meant there is that this is similar to Exmark, in that if you look at the claims and the different limitations that are recited, you've got the position-determining device, the wireless communication device, then the controller. The controller has to talk on the data bus, and you've got to be able to download. So it's all of those things, and that's exactly... But there are components in the 278 that are cited, but they're not the invention. Right. So I would say that... Right. ...you still have to do an apportionment. That doesn't cover... In the 278 patent doesn't mean that that eliminates the need for apportionment when it's not what the 278 invention is about. Do you understand my question? I do, Your Honour, and I think I'll go back to the testimony from Hergesheimer that I just quoted, because I think that's the key, that Hergesheimer and Iberger, excuse me, because they really said this. They said the value of the LMU is in having multi-vehicle functionality so that you can read something off the data bus, but then also in having these downloadable scripts that make that multi-vehicle function work. Those are the two key components of the 278, and this testimony, which I think is really remarkable to have, that that's the value, says CalAMP itself, that is the point of novelty. That is what the 278 patent is all about. So in that, I think that it is coextensive with the patent. Can I just take you to the process point regarding damages? And in our opinion, our initial opinion, we said on remand the parties are urged to achieve clarity by clearly presenting evidence, objections, arguments, and jury instructions as to infringement, damages, blah, blah, blah, blah, blah. And my understanding and reading of the record is you all go back to the district court judge, and I think he said we don't really understand very well the way he conducts his court, which may be fair. But do you think that he was correct in not allowing them to at least bring their expert in on rebuttal on the license agreements given the remand and this new trial on damages? Absolutely, Your Honor. This is classic. It's waiver on waiver. He ruled very clearly they made the request after the first trial and said we need a new trial because you should have allowed us to do this. He then said, no, I find that that argument is waived. They then did not appeal that. That was just conceded by Mr. Trella. It's a very clear position, clear decision that he had made that should have been appealed if that was something that Calamp wanted either this court to consider or in a remand for the jury ultimately to consider that in its determination. And that's at 17. It certainly was a waiver as far as the first trial was concerned. And they couldn't challenge the first trial on that ground, not having appealed. But why does that ruling necessarily carry over when there has to be a new trial on damages? Why is that? Because they... Wait. Why at that point does the ruling necessarily carry over? Because they could have and did not appeal it. And so it becomes law of the case. At a minimum, they have to show that that decision on remand amounts to an abuse of discretion. But when they knew that this was an issue, they had it within their power to appeal it after the first decision that he made, I think it's completely within the judge's discretion to decide that he's not going to go back and reconsider that ruling. Could I ask you about the infringement issue and the corresponding device code limitation? Certainly. Mr. Trella, I think, correctly points out that your expert propounded an impermissible theory under our first decision in this case. But the question is whether there was evidence to support a permissible theory. Would you address that, please? I would. And what I would say is I think that the court, for both the 885, if the court does address it on the merits, and the 278. 278. OK. The court doesn't need to go any further than, again, CalAMP's own admissions. These are from Mr. Chen. And you may recall that in the first appeal, Mr. Chen was the internal engineer whose testimony was excluded with respect to a good faith belief of non-infringement. So he was the witness that CalAMP actually appealed to this court and said, no, we need to be able to present more from him as to what he believed about infringement. On pages 19522, he testifies three times that the LMU stores device codes within it and that it reads device codes from the bus and that these are from vehicle devices. In this dialogue, it actually, the questioning counsel actually wants to make clear. Now, you know that device codes are signals from a vehicle device. This is how it was construed by the court. He says, yes, OK, I understand. So on these pages, 19522, 19523, CalAMP's witness on non-infringement himself testifies that, yes, the LMU is going to be receiving from various device, device, vehicle devices, device codes. He then also says on page 19527, and this is specific to the 257, he admits when it comes to Dependent Claim 6, now you agree that one of the vehicle codes is for reading from at least one vehicle device within the LMU. And his answer is yes. So exactly as Your Honor said, and I actually think that the testimony of our expert is not as it was portrayed by Mr. Chella, so if I could adjust that for an additional minute, I'd appreciate it. But Your Honor, Judge Dyke, you are exactly right, that there is plenty of evidence, plenty of substantial evidence from this, from the entirety of the record, that there is a corresponding vehicle code that is related to the enabling data that's downloaded to satisfy infringement on the 278. Before we run out of time, let me ask you one other question on vacating the 885. If this doesn't have any consequences, why are you fighting it so hard? And obviously I'm not going to suggest what this court should or should not do with regard to decisions on its own jurisdiction. I think our point is simply that the precedent from this court is that it should decline to review it. That's from personalized user model versus Google as well as the MIT court. But why are you fighting vacating it if it doesn't have any consequences? If Your Honor, if that's what you choose to do, then I would not. We were just trying to point out that the precedent is that you decline to review it because CalAMP does not itself have jurisdiction, which is different from all of the other cases that they have pointed to where there was jurisdiction originally and then something happened while it was on appeal to moot the decision. And this case is different from those. Ms. Willroyce, I know your time has expired and you haven't gotten to your cross appeal, but we can obviously rest on the briefs on that. But I do have one final clarification on the discussion we were having about 10 minutes ago about damages, and that's that you concluded by resting fairly heavily, at least, on Mr. Hergesheimer's testimony. Am I correct about that? He is one of the two witnesses. He was not the expert. He was one of CalAMP's two witnesses, Mr. Hergesheimer and Mr. Eiberger, who I testified. Are you calling out particularly Mr. Hergesheimer? I don't want to put words in your mouth. I just thought that you thought that what he did, his testimony was quite significant. Am I wrong? That's correct. Okay. I just wondered if you could give us the cites for that, because I do know you do cite some of his testimony at 31 and 32 of the brief, and I don't know if those are the cites you meant or if it's somewhere else in your brief. I just don't want to get confused when we take the case later. Could you give us the cites? Sure. The deposition testimony that was cited starts at 19-620 and runs through 19-622. During those pages, he says that the LMU development was for purposes of customer demand. He then says that they were not able to find alternative designs, and he says that if it didn't work on multiple vehicles, that it would be of limited value. The other testimony that I cited that was similar is from Iberger, which is at JA-14-722, which, again, says that the LMU would be of, I think he actually says, no value if you were unable to download scripts, which is the enabling data from the 278 patent. Okay. Thank you very much. Thank you. Yes. Thank you, Your Honors. Mr. Trello, we'll restore three minutes of rebuttal. Thank you, Your Honor. Very briefly, picking up on that last point, I think if the court looked at the testimony of Iberger and Hergesheimer, it does not support this notion that the entire value of the LMU is attributable to the 278 patent. And to the contrary, and we noted this in our brief, Omega had an infringement claim involving Cal-Am's V-Pod products, which provide a chunk of the same functionality as the LMU, and they said those infringed the 278 patent. The jury found that they don't. So we know that at least we have a finding, an unappealed finding, that a part of what the LMU does is not the invention, it's not claimed by the 278 patent, and there's no evidence to apportion the unclaimed part from the claimed part. So I think that's a fundamental problem, and that cited testimony doesn't fix it. Going back to the testimony that was cited from Mr. Chen, this is on the infringement point, Mr. Chen testified that, yes, the LMU can read device codes sent by a vehicle device, but there was no linking of that to the corresponding vehicle device code as used in the 278 patent. And we've got a situation here where the jury was told by their expert that the corresponding vehicle device code he was relying on was something different. So it's clear at a minimum that the jury could have relied on an improper basis in reaching its verdict, and under this court's decision and Litton and other cases, that would call for at least a new trial. And finally, I'm going back to damages. I'm sorry for jumping around. The problem with that is that you didn't object to his testimony, right? Oh, well, Your Honor, there was a lengthy exchange at trial on this question, and I'm fumbling around here. And it's at appendix pages 23657 through 23672, where we went back and forth with the court about the improper device code theory that was being presented. We renewed that in the post-trial JMAL motion, which was filed basically a day after this exchange. And the court even acknowledged in its JMAL order at appendix page 25, that we had said that one of our bases was that Omega had misled the jury about the proper construction of device code. And so we definitely raised this with the district court. The district court considered it and basically rejected our position. If the court has no further questions, I will stand on the briefs on the remaining issues. Thank you. Thank both sides, and the case is submitted. Thank you, Your Honor.